# United States Court of Appeals
## For the First Circuit

No. 04-1155

NARRAGANSETT INDIAN TRIBE OF RHODE ISLAND,
Plaintiff, Appellant,

v.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS;
DONALD L. CARCIERI, in his official capacity as GOVERNOR;
PATRICK C. LYNCH, in his official capacity as the
ATTORNEY GENERAL; STEVEN M. PARE, in his official capacity
as Colonel of the Rhode Island State Police; JUSTICES OF
RHODE ISLAND DISTRICT AND SUPERIOR COURTS; TOWN OF
CHARLESTOWN; CHARLESTOWN POLICE DEPARTMENT,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. William E. Smith, U.S. District Judge]

Before
Torruella and Howard, Circuit Judges,
and DiClerico, Jr.,[*] District Judge.

Douglas J. Luckerman, with whom John F. Killoy, Jr., were on brief, for appellant.
Joseph S. Larisa, Jr., Assistant Solicitor, was on brief, for appellee the Town of Charlestown and Charlestown Police Department.
Claire J. Richards, Special Counsel, was on brief, for appellee Governor Donald L. Carcieri.
Neil F.X. Kelly, Assistant Attorney General, with whom Patrick C. Lynch, Attorney General, was on brief, for appellee State of Rhode Island.

May 12, 2005

---

[*] Of the District of New Hampshire, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>. On July 14, 2003, Rhode Island State Police executed a search warrant and confiscated inventory at a smoke shop ("the Smoke Shop") located on Narragansett tribal land. An altercation ensued between members of the Narragansett Indian Tribe ("the Tribe" or "the Narragansetts") and several State police officers, resulting in the arrest of eight tribal members, including the Chief Sachem of the Tribe.

Following this incident, both the Narragansetts and the State of Rhode Island filed suits disputing the issue of whether the Tribe's operation of a smoke shop and sale of cigarettes on the Tribe's settlement lands are exempt from the application and enforcement of Rhode Island's cigarette tax laws. The State initially filed its complaint in Rhode Island state court and the Narragansetts removed the case to federal district court in an attempt to have it decided together with the Tribe's complaint, which was brought in federal district court. The district court found that it did not have jurisdiction over the state case and remanded it to the state court. However, the district court treated the State's motion for summary judgment in its case as a motion for summary judgment in the Tribe's federal case and decided the federal case accordingly. The district court granted summary judgment in favor of the State, and the Narragansett Tribe now brings the instant appeal.

We must decide three questions related to this incident. First, we are asked whether the district court could exercize jurisdiction over the State's complaint. Second, we must decide whether the Narragansett Tribe has sovereign immunity from the Rhode Island tax on cigarettes, focusing on whether the legal incidence of the cigarette tax falls on the tribe or the consumer of the cigarettes. Finally, we must determine whether the State exceeded its authority in the enforcement of its cigarette tax on settlement lands in violation of the Tribe's sovereignty.

## I.  Background

The parties submitted this case on stipulated facts, thus, "no evidence contrary to the facts stipulated can be considered." Gómez v. Rodríguez, 34 F.3d 103, 121 (1st Cir. 2003). We review the factual findings under the clear-error standard, and the "ultimate application of the law to those facts" remains "subject to de novo review." Reich v. John Alden Life Ins., Co., 126 F.3d 1, 6-7 (1st Cir. 1997).

The Narragansett Indian Tribe is a federally recognized Indian tribe located in the State of Rhode Island. See Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed. Reg. 6177 (Feb. 10, 1983). The Tribe is primarily situated on 1800 acres of land known as the settlement lands, which were given to the Tribe in the Rhode Island Indian Claims Settlement Act ("the Settlement Act"), 25 U.S.C. §§

-3-

1701-1716. The relationship between the Narragansett Tribe and the State of Rhode Island is defined, in a number of ways, by the Settlement Act. In the mid-1970s, the Narragansett Indian Tribe brought two lawsuits in which they claimed aboriginal entitlement to 3200 acres of land in Charlestown, Rhode Island. Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp., 418 F. Supp. 798 (D. R.I. 1976); Narragansett Tribe of Indians v. Murphy, 426 F. Supp. 132 (D. R.I. 1976). The Settlement Act implemented the Joint Memorandum of Understanding ("the JMOU") between the Narragansetts and the State of Rhode Island, H.R. Rep. No. 95-1453, at 25-28 (1978), reprinted in 1978 U.S.C.C.A.N. 1948, 1962-66, that resolved these lawsuits. See H.R. Rep. No. 95-1453, at 5.

Under the terms of the JMOU and Settlement Act, the State provided 900 acres to the Narragansetts and the Federal government agreed to provide funding for the purchase of an additional 900 acres. These lands comprise the 1800 acres we refer to as the settlement lands. In exchange for this provision of land to the Tribe, the State negotiated for and received the continued applicability of State law to the settlement lands. See 25 U.S.C. § 1708(a) ("Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.").

## A. The Rhode Island Cigarette Tax Scheme

The sale of cigarettes in Rhode Island is governed by a number of statutory requirements, including taxation provisions. See R.I. Gen. Laws §§ 44-20-1 to 44-20-55. The State's cigarette tax scheme imposes the following requirements:

> Every person engaged in the sale of cigarettes in Rhode Island must first obtain a license from the State Tax Administrator. R.I. Gen. Laws § 44-20-2. In addition to this licensing requirement, Rhode Island imposes an excise tax on cigarettes sold, distributed, held, or consumed within its borders. R.I. Gen. Laws § 44-20-12. The tax is collected through the sale of cigarette stamps, which must be affixed to all packages of cigarettes possessed within the State (with limited exceptions). R.I. Gen. Laws § 44-20-13, 44-20-18, 44-20-30. State law also requires a retailer to add a sales tax to the sale price of the cigarettes. R.I. Gen. Laws § 44-18-19.

Narragansett Indian Tribe v. Rhode Island, 296 F. Supp. 2d 153, 163 (D. R.I. 2003). The excise tax requires that distributors

> affix tax stamps in the proper denominations at the location where their license is issued. The stamps may be affixed to a distributor's cigarettes at any time before transferring the possession of the cigarettes. R.I. Gen. Laws § 44-20-28. When a dealer receives unstamped cigarettes, he or she must affix stamps within twenty-four hours after coming into possession of the cigarettes. R.I. Gen. Laws § 44-20-29. . . . State law makes it unlawful to sell or possess unstamped cigarettes, see R.I. Gen. Laws §§ 44-20-35, 44-20-36, and cigarettes not bearing stamps that are not exempt are contraband and subject to seizure by the State. R.I. Gen. Laws §§ 44-20-37, 44-20-38.

Narragansett Indian Tribe, 296 F. Supp. 2d at 163.

-5-

Moreover, Rhode Island, with the assistance of the Federal government, has a system by which it collects sales taxes on cigarettes from consumers who reside in the State and purchase cigarettes from out-of-state dealers. See The Jenkins Act, 15 U.S.C. § 375-378 (requiring persons shipping or delivering cigarettes to a state that taxes the sale or use of cigarettes to comply with various reporting requirements identifying to the state the monthly cigarette shipments and the consumers who purchased them).

## B. The Dispute

On July 1, 2003, the Narragansett Indian Tribe's Tribal Council passed a resolution authorizing the opening of a tribally owned Smoke Shop to sell cigarettes. The Tribe stipulated that the purpose of opening the Smoke Shop was to provide a means for economic development for the Tribal Nation. The Tribe imported unstamped cigarettes from other states and stored them in anticipation of the Smoke Shop's opening. The Smoke Shop, which opened on July 12, 2003, was located entirely within the Tribe's settlement lands. The Shop offered unstamped, untaxed cigarettes for sale to both tribal and non-tribal members without collecting Rhode Island's seven percent retail sales tax from any of its customers. As stipulated before the court below, "a large proportion of the Shop's customers were not members of the Tribe."

Narragansett Indian Tribe, 296 F. Supp. 2d at 158 (referencing the Joint Stipulations of the parties).

The day the Smoke Shop opened, the Rhode Island State Police sought a search warrant to search the Smoke Shop for alleged violations of Rhode Island's cigarette tax laws, specifically, the possession and sale of unstamped cigarettes, which is a misdemeanor offense. See R.I. Gen. Laws §§ 44-20-35, 44-20-36; see also id. at §§ 44-20-37, 44-20-38 (allowing for the seizure of such cigarettes as contraband). The State of Rhode Island District Court issued the requested warrant to search the Smoke Shop that same day. On July 14, 2003, Rhode Island State Police entered the Narragansett Tribe's settlement lands and executed the search warrant on the Chief Sachem of the Narragansett Indian Tribe. The State Police confiscated the Tribe's inventory of unstamped cigarettes as well as various documents and monies. An altercation ensued between the State Police and some tribal members, resulting in the arrest of the Chief Sachem and seven other tribal members.

Both the Narragansetts and the State brought suit over this incident. The district court found that it had jurisdiction over the Tribe's case, which was originally brought in federal district court. See 28 U.S.C. § 1362 (providing that "The [federal] district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the

-7-

matter in controversy arises under the Constitution, laws, or treaties of the United States."). However, the district court found that it did not have subject matter jurisdiction over the State's action, which was originally brought in Rhode Island State Superior Court and later removed to the federal district court by the Tribe. The State had brought its action pursuant to Rhode Island law seeking a declaration that the Tribe's failure to comply with Rhode Island's cigarette sales and excise tax scheme was unlawful. The district court therefore remanded the State's suit back to the Washington County Superior Court, but determined that it would "treat the State's motion for summary Judgment in the State's case as a motion for summary judgment in the Tribe's action." Narragansett Indian Tribe, 296 F. Supp. 2d at 160 n.5.

Faced with cross motions for summary judgment, the district court granted summary judgment in favor of the State, holding that: (1) the legal incidence of the State's Cigarette Tax falls on the consumer, and not the Tribe; (2) the State did not violate federal law or the Tribe's sovereign rights when it enforced its criminal statutes by executing a search warrant, and making arrests pursuant to that warrant, on tribal land; and (3) the Tribe must comply with the Cigarette Tax if it wishes to continue selling cigarette products on the settlement lands.

-8-

## II.  **Analysis**

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the appellant.  Fenton v. John Hancock Mut. Life Ins., 400 F.3d 83, 87 (1st Cir. 2005).  We will uphold the grant of summary judgment if there is no genuine issue of material fact and appellees are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

### A.  **Jurisdiction over the State's Complaint**

The Tribe asserts that the well-pleaded complaint rule did not deprive the district court of jurisdiction over the State's complaint, which the Tribe removed from state court to federal district court.[1]  The federal district court determined that it did not have subject matter jurisdiction over the State's complaint because (1) the State did not bring its "claims under the Settlement Act;" (2) 28 U.S.C. § 1362 does not provide a viable basis for federal jurisdiction because it "only vests jurisdiction in a federal court over actions brought by an Indian tribe under the laws of the United States;" and (3) the district court found the cases cited by the Tribe in support of removal to be "unavailing and inapposite."  Narragansett Indian Tribe, 296 F. Supp. 2d at 160.

---

[1]  Under the well-pleaded complaint rule, it must be clear from the plaintiff's complaint that there is a federal question.  Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152 (1908).

The Tribe argues that the district court should have applied the "artful pleading rule" to the State's complaint.[2] But the alleged federal issue -- whether the State has authority to tax the Tribe under the Settlement Act -- is a defense. Even had it been preemptively included and argued against in the State's complaint, it would not have given rise to federal question jurisdiction over the State's complaint. See Louisville & Nashville R.R., 211 U.S. at 152 (holding that the federal court lacked subject matter jurisdiction under § 1331 because the federal issue arose only from the plaintiff's anticipation of a defense based on a federal statute).

> It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution.

Id. Therefore, we find that the court did not err in failing to apply the artful pleading rule in this instance.

---

[2] The "artful pleading rule" bars a plaintiff from concealing a necessary federal question by omitting it from the complaint. Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 22 (1983).

## B. The Legal Incidence of the Cigarette Tax

The question of whether the legal incidence of Rhode Island's cigarette tax scheme falls on the Narragansett Tribe, as dealers of cigarettes, or merely on the consumer or non-Indian purchaser of the cigarettes, will likely determine whether the Narragansetts are required to comply with the tax scheme. The Narragansetts argue that the legal incidence of Rhode Island's cigarette tax falls directly on the Tribe and its members, and that the tax may not be enforced against the Tribe without express congressional authority. The State, on the other hand, argues that the legal incidence of the cigarette tax, as stated in the language of the Rhode Island statute, rests on the consumer rather than the Tribe. See R.I. Gen. Laws § 44-20-53 ("All taxes paid in pursuance of this chapter are conclusively presumed to be a direct tax upon the retail consumer, precollected for the purpose of convenience and facility only.").

If the legal incidence of the cigarette tax falls on the Tribe itself, it presents serious tribal sovereignty concerns that might preclude the State from enforcing its tax due to the United States' recognition of the Narragansetts as a sovereign Indian tribe. Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458-59 (1995) (citing Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 483 (1976)). Such a "tax

cannot be enforced absent clear congressional authorization." Chickasaw Nation, 515 U.S. at 459.

The district court determined that the legal incidence of Rhode Island's cigarette tax falls on the consumer and not the Narragansett Tribe, noting that the pass through provision in Rhode Island's statute was plain. Narragansett Indian Tribe, 296 F. Supp. 2d at 167. The district court stated that "[w]hile the Supreme Court has held that a tax scheme does not need to contain such an express statement to place the legal incidence of the tax on the consumer, the Court has enforced such provisions when they are present." Id.

In adjudicating matters of state law, federal courts ordinarily defer to the decisions of state courts. For example, in Gurley v. Rhoden, 421 U.S. 200 (1975), a gasoline retailer claimed that because the legal incidence of the state's gasoline excise tax fell on his consumers and he therefore merely collected the tax for the state, due process entitled him to deduct the state tax from the amount of his sales which were subject to a state sales tax. The Mississippi Supreme Court held that the legal incidence of the excise tax fell on petitioner. In deciding Gurley, the Supreme Court observed that "a State's highest court is the final judicial arbiter of the meaning of state statutes," and said that "[w]hen a state court has made its own definitive determination as to the operating incidence, . . . [w]e give this finding great weight in

-12-

determining the natural effect of a statute, and if it is consistent with the statute's reasonable interpretation it will be deemed conclusive." Id. at 208 (citing American Oil Co. v. Neill, 380 U.S. 451, 455-456 (1965).

The Narragansett Tribe cites Gurley as the basis for its argument that the district court should not have made an independent determination of the legal incidence under Rhode Island law. Rather than making an independent determination, the Tribe contends, the district court should have given great weight to Daniels Tobacco Co. v. Norberg, 114 R.I. 502, 506 (1975), a Rhode Island State Supreme Court decision regarding the legal incidence of the cigarette tax. Daniels involves a ruling by the Rhode Island State Tax Administrator ordering a distributor to pay the taxes due on cigarettes and tobacco products that were stolen prior to sale. The distributor appealed the decision in state courts, arguing that as a distributor he should not be liable for the imposition of the cigarette tax on the stolen cigarettes because R.I. Gen. Laws § 44-20-12 does not make a distributor liable for the cigarette tax, and furthermore, R.I. Gen. Laws § 44-20-53 states that cigarette taxes are a direct tax on the consumer, precollected for convenience only. Daniels, 114 R.I. at 505. The Rhode Island State Supreme Court ultimately

> determine[d] that the legislative intent in
> enacting § 44-20-12(1) was to place the risk
> of loss of cigarettes on the distributor and

-13-

> not on the state," noting that "§ 44-20-28 . . . requires a distributor to affix tax stamps to all cigarettes he distributes. In addition, the mere fact that the ultimate economic burden of a tax is one [sic] the consumer does not determine the legal incidence of the tax.

Id. at 506 (citing Ferrara v. Director, Div. of Taxation, 127 N.J. Super. 240, 317 A.2d 80 (1974)). Thus, the Tribe argues that Daniels establishes that the legal incidence falls on the Tribe.

However, "[i]n situations wherein federal immunity is affected by a determination as to which party to a transaction bears the legal incidence of a state tax, the federal courts 'are not bound by the state court's characterization of the tax.'" Confederated Tribes of Colville Reservation v. State of Washington, 446 F. Supp. 1339 (E.D. Wash. 1978), (quoting First Agric. Bank v. Tax Comm'n, 392 U.S. 339, 347 (1968), aff'd in part, reversed in part, 447 U.S. 134, 151 (1980)). Rather, in cases where courts must determine whether the legal incidence of a tax falls on an Indian tribe, courts apply federal law. See, e.g., Sac and Fox Nation v. Pierce, 213 F.3d 566, 578 (10th Cir. 2000) ("For our purposes, the question of where the legal incidence of the Kansas motor fuel tax rests is one of federal law."); see also United States v. Mississippi Tax Comm'n, 421 U.S. 599, 609 n.7 (1974)).

The Narragansett Tribe argues that the district court should not have applied federal law. Citing Kern-Limerick, Inc. v.

Scurlock, 347 U.S. 110 (1954), the seminal Supreme Court case underpinning Gurley and other tax incidence cases, the Tribe notes that the Supreme Court instructs federal courts to defer to state courts on questions of where the incidence of a state tax falls, unless the case involves "federal constitutional issues." Id. at 121. The Tribe asserts that the "federal immunity" at issue in Kern-Limerick does not encompass tribal immunity because, the Tribe argues, tribal sovereignty does not arise under federal or constitutional law, but rather from the inherent sovereignty of the Tribe. The Narragansetts point to United States v. Lara, 541 U.S. 193 (2004), as confirming that tribal sovereignty does not arise under the Constitution or federal law. Lara involves a double jeopardy claim brought in light of recent congressional legislation that authorizes Indian tribes to prosecute members of other Indian tribes. The resolution of this claim hinged on whether there was dual sovereignty, leading the Lara court to consider whether the source of the power to punish nonmember Indian offenders is "inherent tribal sovereignty" or delegated federal authority. Id. at 1632. The Supreme Court determined that "Congress intended the former" because "the statute says that it 'recognize[s] and affirm[s]' in each tribe the 'inherent' tribal power (not delegated federal power) to prosecute nonmember Indians for misdemeanors" and because "the statute's legislative history confirms that such was Congress' intent." Id. at 1632-33. Based on this logic, the Tribe

-15-

asserts that federal courts must look first to an existing interpretation of state law by the state's highest court in cases such as the instant case.

The Tribe, however, ignores Supreme Court precedent to the contrary. For example, in Kiowa Tribe v. Manufacturing Technologies, Inc., the Supreme Court stated that "[l]ike foreign sovereign immunity, tribal immunity is a matter of federal law." 523 U.S. 751, 759 (1998). The Tribe also ignores the Supreme Court's precedent where the Court accepted a district court's use of federal law in determining whether the legal incidence of the Washington tax fell on the Indian tribe over the state court's interpretations. See Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 142 (1980); California State Bd. of Equalization et al. v. Chemehuevi Indian Tribe, 474 U.S. 9, 11 (1985)(explicitly reiterating that the Court accepted the district court's conclusion that the legal incidence of Washington state's cigarette tax fell on purchasers). In addition, other courts have consistently applied federal law in deciding whether the legal incidence of a state tax falls on a sovereign Indian tribe. See, e.g., Sac and Fox Nation, 213 F.3d at 578 (noting that "the question of where the legal incidence of the Kansas motor fuel tax rests is one of federal law" in a case regarding whether the State of Kansas could impose its tax on fuel distributed to tribally owned and operated retail stations located on Indian lands within

-16-

the State) (citing <u>United States</u> v. <u>Mississippi Tax Comm'n</u>, 421 U.S. 599, 609 n. 7 (1975)); <u>Kern-Limerick</u>, 347 U.S. at 121-22; <u>Coeur D'Alene Tribe</u> v. <u>Hammond</u>, 384 F.3d 674, 681 (9th Cir. 2004) ("The incidence of a state tax on a sovereign Indian nation inescapably is a question of federal law that cannot be conclusively resolved in and of itself by the state legislature's mere statement.").

Even if we were to consider the Rhode Island Supreme Court's decision in <u>Daniels</u>, it is not outcome determinative. <u>Daniels</u> predates the Supreme Court decisions, such as <u>Moe</u>, 425 U.S. at 482, that held that pass through tax provisions are dispositive as to who bears the legal incidence of a tax. In <u>Moe</u>, the Supreme Court evaluated a Montana tax statute that provided that the tax "shall be conclusively presumed to be [a] direct [tax] on the retail consumer precollected for the purpose of convenience and facility only." <u>Id.</u> (quoting Mont. Rev. Code Ann. § 84-5606(1) (1947)). The Supreme Court determined that "to the extent that the 'smoke shops' sell to those upon whom the State has validly imposed a sales or excise tax . . . the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's enforcement and collection thereof." <u>Id.</u> The Supreme Court has repeatedly affirmed that cigarette tax schemes containing pass through provisions place the legal incidence of the tax on the consumer rather than the distributor. <u>See</u> <u>Chickasaw</u>, 515 U.S. at

-17-

461; <u>Milhelm Attea</u>, 512 U.S. at 64; <u>Chemehuevi</u>, 474 U.S. at 11; <u>Colville</u> 447 U.S. at 159. Therefore, the holding of <u>Daniels</u> does not persuade us that the incidence of the Rhode Island cigarette tax falls on the Narragansetts.

It is not required that the law expressly state that the tax must be passed on to the ultimate purchaser for a State to require a tribe to collect cigarette taxes from non-Indian purchasers and remit it to the State. <u>Chemehuevi</u>, 474 U.S. at 11. The Supreme Court has instructed that the test we should apply in determining whether the incidence of a state tax falls on an Indian tribe is to make "a fair interpretation of the taxing statute as written and applied." <u>Id.</u> In this case, the Rhode Island tax statute explicitly states that the cigarette taxes are "conclusively presumed to be a direct tax upon the retail consumer, precollected for the purpose of convenience and facility only." R.I. Gen. Laws § 44-20-53. As the Supreme Court held in <u>Moe</u>, "[t]he State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." <u>Moe</u>, 425 U.S. at 483. We therefore find that the legal incidence of the Rhode Island cigarette tax falls on the consumer, not the Narragansett Tribe, and we find that the State may require the Tribe to comply with the cigarette tax in order for the State

-18-

to collect the cigarette taxes that are passed on to the Tribe's non-Indian consumers.

## C. Unanswered Questions

The State posits that it has raised two independently sufficient grounds on which we might affirm the district court's judgment, even if the legal incidence of the tax is found to fall on the Tribe. Since we find that the legal incidence of the tax does not fall on the Narragansett Tribe, we find it unnecessary and inappropriate to decide these questions. The grounds put forth by the State are (1) that the settlement lands are not "Indian country,"[3] and (2) that direct taxation of the Tribe by the State is allowed pursuant to both section 1708 of the Settlement Act, 25

---

[3] Indian country is usually "the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co., 89 F.3d 908, 915 (1996) (quoting Indian Country, U.S.A. v. Oklahoma Tax Comm'n, 829 F.2d 967, 973 (10th Cir. 1987)). Indian country is defined by Congress as including:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments . . . .

18 U.S.C. § 1151; see Narragansett Elec. Co., 89 F.3d at 915. The Supreme Court has repeatedly applied this definition to issues of both criminal and civil jurisdiction. Id. at 915; (quoting California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208 (1987)).

U.S.C. § 1708(a), and the Tribe's consent,[4] implicit in its agreement to subject the settlement lands to the "full force and effect" of "all laws of the State of Rhode Island," in the Joint Memorandum of Understanding between the Narragansett Tribe and the State of Rhode Island, H.R. Rep. No. 95-1453, at 26, reprinted in 1978 U.S.C.C.A.N. 1948, 1964.

The Narragansetts, on the other hand, want us to declare that the settlement lands are Indian country and that the State does not have authority to tax the Tribe directly because Congress did not expressly and unequivocally consent to state taxation of the Narragansett Tribe. McClanahan, 411 U.S. at 177-78 (laying to rest any doubt that taxation of Indian reservation lands or Indian income from activities carried on within the boundaries of reservation lands is not permissible absent unmistakably clear congressional consent); see also Montana v. Blackfeet Tribe, 471 U.S. 479, 765 (1985); Brian v. Itasca County, 426 U.S. 373, 376 (1976).

---

[4] Congress has granted the consent of the United States to States wishing to assume criminal and civil jurisdiction over reservation Indians, 25 U.S.C. § 1322(a), and 25 U.S.C. § 1324 confers upon the States the right to disregard enabling acts which limit their authority over such Indians. However, "the Act expressly provides that the State must act 'with the consent of the tribe occupying the particular Indian country,' 25 U.S.C. § 1322(a), and must 'appropriately (amend its) constitution or statutes.' 25 U.S.C. § 1324." McClanahan v. State Tax Comm'n of Arizona, 411 U.S. 164, 177-78 (1973).

We find it unnecessary and inappropriate to decide these questions today. Because we affirm the district court's holding that the legal incidence of Rhode Island's cigarette tax falls on the consumer and not the tribal distributor, it is unnecessary for us to consider whether the tax would be valid if it were a direct tax on the Tribe.

## D. Sovereign immunity and the State's enforcement of its laws on the Tribe's settlement lands

The Narragansetts claim that the State of Rhode Island exceeded its authority in enforcing its cigarette laws against the government of the Narragansett Indian Tribe and that the State thereby violated the Tribe's sovereign immunity. The State argues, conversely, that since the State's civil and criminal laws and jurisdiction apply to the settlement lands pursuant to 25 U.S.C. § 1708, the State has concomitant ability to enforce its laws there, including those governing the sale of cigarettes. The State also argues that the Tribe's sovereign immunity was abrogated by section 1708, and therefore tribal sovereign immunity does not bar the State's enforcement of its laws on the settlement lands.

The Tribe asks us to consider six distinct questions regarding the enforcement of Rhode Island's cigarette laws on the settlement lands, including (1) whether the State may invoke its jurisdiction over the settlement lands to enforce its cigarette tax on the government of the Narragansett Indian Tribe (a Land/Tribe

distinction); (2) whether the State may issue and serve a search warrant for property of the tribal government; (3) whether the State may enter tribal lands to serve a warrant; (4) whether the State may confiscate Tribal government property while on the settlement lands; (5) whether the State can require the Tribe to purchase a license; and (6) whether the State was bound to use less intrusive means in order to enforce the cigarette tax.

We have determined that, since the legal incidence of Rhode Island's cigarette tax falls on the consumer, rather than the tribal distributor, the Narragansetts are obligated to comply with the State's cigarette tax laws as they pertain to cigarettes sold to non-Indian consumers. Therefore, by selling unstamped cigarettes to non-Indian consumers, the Smoke Shop operators violated Rhode Island tax law, which is a criminal offense. This brings us to the questions regarding what measures the State may take to enforce its cigarette tax laws.

Drawing the line between the sovereign rights of the Narragansett Tribe and the State of Rhode Island is complicated by the Rhode Island Indian Claims Settlement Act, which provides for the continued applicability of Rhode Island's civil and criminal laws and jurisdiction over the settlement lands. See 25 U.S.C. § 1708(a). This is an ongoing and overarching question which has vexed the State and Tribe over the years as various issues have arisen. As we have stated before, all of the relevant questions

-22-

cannot be answered by an all-encompassing solution. State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 695 (1994).

## 1. Whether 25 U.S.C. § 1708(a) abrogates the Tribe's Sovereign Immunity on the Settlement Lands

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martínez, 436 U.S. 49, 58 (1978) (citations omitted); see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 508 (1991); Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1066 (1st Cir. 1979). This aspect of tribal sovereignty is subject to the "superior and plenary control of Congress." Santa Clara Pueblo, 436 U.S. at 58. Absent a clear, express waiver of sovereign immunity by Congress or the Tribe, suits against Indian tribes are generally barred. Kiowa, 523 U.S. at 755.

The Narragansett Tribe argues that its sovereign immunity is a complete defense to the State's enforcement of its cigarette laws against the Tribe. The State responds that Congress, by granting jurisdiction to the state in 25 U.S.C. § 1708, abrogated the Tribe's sovereign immunity on the settlement lands. In Narragansett Indian Tribe, 19 F.3d at 701, we stated that "the grant of jurisdictional power to the state in the Settlement Act is valid and rather broad . . . ." We agree with the State that this grant of jurisdictional power, in addition to the applicability of

-23-

the State's civil and criminal laws, provides the State with the right, and to some extent the means, to enforce these laws on the settlement lands.

However, this does not mean that we agree with the State that Section 1708(a) abrogates the Tribe's sovereign immunity altogether. On the contrary, we have recognized and enforced the Tribe's sovereign immunity in the past. See Maynard v. Narragansett Indian Tribe, 984 F.2d 14, 15-16 (1st Cir. 1993). The State suggests that Maynard stands only for the proposition that Congress did not abrogate sovereign immunity for tribal conduct outside the settlement lands. We disagree. There is nothing in our analysis of the Settlement Act in that case which suggests that we have drawn a distinction based on where tribal activities occur. The fact of the matter is that Section 1708 does not expressly address the issue of sovereign immunity, and it would be inappropriate for us to infer that the congressional grant of jurisdiction to the State acts as a wholesale abrogation of the Tribe's sovereign immunity. It is well settled that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." Chickasaw Nation v. United States, 534 U.S. 84, 93-94 (2001). In fact, the language of Section 1708 does not purport to waive any of the Tribe's rights.

> [T]he mere fact that the Settlement Act cedes
> power to the state does not necessarily mean
> . . . that the Tribe lacks similar power and,

-24-

thus, lacks 'jurisdiction' over the settlement lands.  Although the grant of jurisdictional power to the state in the Settlement Act is valid and rather broad, . . . we do not believe that it is exclusive.  To the contrary, we rule that the Tribe retains concurrent jurisdiction over the settlement lands . . . .

Narragansett Indian Tribe, 19 F.3d at 701.  The Tribe, therefore, retains its sovereign immunity despite the grant of jurisdiction to the State in Section 1708(a).

The Tribe's immunity does not, however, provide a complete defense to the enforcement of State laws.  There remains a question of the extent to which the State may encroach upon the Tribe's settlement lands to enforce its criminal laws.  Neither this Court, nor the Supreme Court, has issued definitive guidance on this question.

**2.  Whether the State may invoke its jurisdiction over the settlement lands to enforce its cigarette tax**

The district court considered the holdings of Nevada v. Hicks, 533 U.S. 353 (2001), and Colville "in conjunction with the conferral of criminal and civil (which includes regulatory) jurisdiction contained in section 1708," and found it to be "beyond doubt that criminal law enforcement, including the seizure of contraband, on the Settlement Lands is permissible."  Narragansett Indian Tribe, 296 F. Supp. 2d at 171.  In Hicks and Colville, the Supreme Court discusses some allowable enforcement by a state

-25-

concerning activities by an Indian tribe which has sovereignty and does not necessarily share jurisdiction over its tribal lands with the State. The Hicks Court recognized that "the principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.'" Hicks, 533 U.S. at 362 (citing Colville, 447 U.S. at 156). The Court offered the following guidance:

> When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified by our decision in [Colville]. . . . It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed . . . off the reservation. While it is not entirely clear from our precedent whether the last mentioned authority entails the corollary right to enter a reservation (including Indian-fee lands) for enforcement purposes, several of our opinions point in that direction. In [Colville], we explicitly reserved the question whether state officials could seize cigarettes held for sale to nonmembers in order to recover the taxes due.

Hicks, 533 U.S. at 362-63 (2001) (citations omitted). Taking the Supreme Court's discussion of the enforcement issue in Hicks and Colville, together with Congress' grant of State jurisdiction over

the settlement lands, the district court concluded that Rhode Island may enforce its criminal laws on the settlement lands, including the seizure of contraband.

The Narragansett Tribe argues that the district court came to the wrong conclusion for several reasons. First, the Tribe asserts that its sovereign immunity is a complete defense to enforcement of the State's laws on the settlement lands. The Tribe relies heavily on a Ninth Circuit decision, Bishop Paiute Tribe v. County of Inyo, for the argument that even where Congress has expressly authorized a state to enforce its criminal laws, a tribe's sovereign immunity bars service of a search warrant against the tribe itself. 291 F.3d 549, 567 n.6 (9th Cir. 2002) ("[T]he search warrant was executed against the tribes in order to obtain information as part of a criminal investigation against individual Indians . . . . [T]he officers had authority to enforce criminal law against individual Indians under Public Law 280, but did not have authority to enforce those criminal laws against tribes as sovereign entities."). However, this decision is not valid precedent, as the Supreme Court vacated and remanded the decision, stating:

> The Tribe has not explained, and the trial and appellate courts have not clearly decided, what prescription of federal common law, if any, enables the Tribe to maintain an action for declaratory relief establishing its sovereign right to be free from state criminal processes. This case is therefore remanded

-27-

> for focused consideration and resolution of that jurisdictional question.

Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701, 702 (2003).

Second, the Narragansetts argue that we should not rest our decision on Colville, because the Supreme Court did not decide the question of state encroachment onto tribal lands to seize cigarettes in that case. The Court refused to express an opinion on the question of whether the state may enter onto a reservation and seize stocks of cigarettes which are intended for sale to non-Indian purchasers. Colville, 447 U.S. at 162.

The Court did, however, determine that the State of Washington's interest in enforcing its valid taxes was sufficient to justify seizures of shipments of unstamped cigarettes as contraband while they were in transit, traveling to the reservations. Id. at 161. "By seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests." Id. at 162.

Unlike the State of Washington in Colville, Congress provided Rhode Island with civil and criminal jurisdiction on the Narragansetts' settlement lands. 25 U.S.C. § 1708(a). In light of this authority and the precedent set in Colville, we find that the State of Rhode Island may have the power to enter onto the settlement lands and seize unstamped cigarettes as contraband, from

-28-

the Indian distributor, provided that the action does not violate the Tribe's sovereign immunity.

### 3. The "Land"/"Tribe" Distinction

The Tribe contends that a distinction should be made between the jurisdiction the State was given over the settlement lands and any power the State might have over the Tribe itself. The Tribe argues that the grant of jurisdiction that Congress gave to the State of Rhode Island merely subjected "the settlement lands . . . to the civil and criminal laws and jurisdiction of the State," 25 U.S.C. § 1708(a), not the Narragansett Tribal government. The Tribe asserts that Congress intentionally limited this jurisdiction to the settlement lands, and that it knew how to write the Act to cover the Tribe as well if it had so intended. See, e.g., Maine Settlement Act, 25 U.S.C. § 1725 (expressly providing the State with jurisdiction over "all Indians, Indian nations, or tribes or bands of Indians in the State of Maine . . . and any lands or other natural resources owned by any such Indian, Indian Nation, tribe or band of Indians, and any lands held in trust by the United States for any such Indian").

In ascertaining the intent of Congress in statutes regulating Indian tribes, we must read the statutes against a backdrop of Indian sovereignty. Colville, 447 U.S. at 178 (citing McClanahan, 411 U.S. at 172). "[T]he [Supreme] Court has held that retained sovereignty includes the power of Indians to make and

-29-

enforce their own substantive law in internal matters, including matters such as membership rules, inheritance rules, and the regulation of domestic relations." Narragansett Indian Tribe, 19 F.3d at 701 (citing Santa Clara Pueblo, 436 U.S. at 56).

Congress did not expressly give the State jurisdiction over the Narragansett Tribe in Section 1708. While we have said that the grant of jurisdictional power to the State is broad, we have also found that "the Tribe retains concurrent jurisdiction over the settlement lands," Narragansett Indian Tribe, 19 F.3d at 701, and that "any effort by the state to exercise [its] authority is hedged in by . . . the Tribe's retained rights of sovereignty . . ." Id. at 705. Therefore, as the district court stated, "when the Tribe acts 'qua Tribe,' that is, as the political entity responsible for governing the Narragansetts, it is not subject to the State's civil and criminal laws and jurisdiction."

The Tribe asserts that the opening and operation of the Smoke Shop was a tribal government activity. The Narragansetts' Smoke Shop was opened pursuant to a resolution passed by the Narragansett Tribal Council with the stated purpose of providing economic development for the Tribal Nation. The Tribe, therefore, asserts that sovereign immunity precludes the State of Rhode Island from entering the settlement lands, serving a warrant on the tribal activity, and confiscating tribal government property as contraband.

While retained tribal sovereignty has never been precisely defined, the Supreme Court has offered the following description:

> Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local self-government. Worcester v. Georgia, 6 Pet. 515, 559, 8 L.Ed. 483 (1832) . . . . Although no longer "possessed of the full attributes of sovereignty," they remain a "separate people, with the power of regulating their internal and social relations." United States v. Kagama, 118 U.S. 375, 381-382, 6 S.Ct. 1109, 1112-1113, 30 L.Ed. 228 (1886). See United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). They have power to make their own substantive law in internal matters, see Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897) (membership); Jones v. Meehan, 175 U.S. 1, 29, 20 S.Ct. 1, 12, 44 L.Ed. 49 (1899) (inheritance rules); United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1176 (1916) (domestic relations), and to enforce that law in their own forums, see, e.g., Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

Santa Clara Pueblo, 436 U.S. at 55-56.

Precedent dictates that the determination of whether the Tribe's retained rights of sovereignty or the State's residual authority takes precedence should involve an interest balancing test that "[t]est[s] the sturdiness" of the barriers each presents and makes a "particularized inquiry into the nature of the state, federal, and tribal interests at stake." Narragansett Indian Tribe, 19 F.3d at 705 (quoting White Mountain Apache Tribe v.

-31-

<u>Bracker</u>, 448 U.S. 136, 145 (1980)).[5]  In this case, we must balance the State's interest in enforcing its cigarette laws with the Tribe's sovereignty interests and related interests in tribal economic development and self-governance.  As we stated previously, the precedent set in <u>Moe</u> and other cigarette tax cases involving Indian tribes is that Indian retailers on an Indian reservation may be required to collect the state cigarette taxes applicable to sales to non-Indians because the minimal burden imposed by this requirement is justified by the State's interest in assuring the payment of these lawful taxes.

The district court applied the test this Court used in <u>Akins</u> v. <u>Penobscot Nation</u>, 130 F.3d 482 (1st Cir. 1997), to determine whether the Tribe's operation of the Smoke Shop should be included in the Tribe's retained right of sovereignty.  In so doing, the district court tightly confined the meaning of sovereign immunity to apply only when the Tribe acts in "matters of local governance." <u>Narragansett Indian Tribe</u>, 296 F. Supp. 2d at 175-77. We find it inappropriate to apply the <u>Akins</u> test in this instance.

---

[5]    We recognize that the Supreme Court has recently granted certiorari for a question regarding whether the Court should abandon the <u>White Mountain Apache</u> interest-balancing test in favor of a preemption analysis based on the principle that Indian immunities are dependent upon congressional intent. <u>Prairie Band Potawatomi Nation</u> v. <u>Richards</u>, 379 F.3d 979 (10th Cir. 2004), <u>cert. granted</u>, 73 U.S.L.W. 3513 (U.S. Feb. 28, 2005) (No. 04-631).

In *Akins*, we established a multi-factor test for determining whether a policy or activity is, or is not, an "internal tribal matter," as that term was used in the Maine state legislation implementing the federal Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1725-1735 ("Maine Settlement Act"). The Maine Implementing Act makes the Penobscot Nation subject "to all the duties, obligations, liabilities and limitations of a municipality . . . provided, however, that internal tribal matters . . . shall not be subject to regulation by the State." Me. Rev. Stat. Ann. tit. 30, § 6206(1) (emphasis added).

While Rhode Island and Maine are similar to the extent that each state has reached a settlement with its Indian tribes which has been enacted by Congress, the provisions of the Maine Settlement Act and Implementing Act are very different from the Rhode Island Settlement Act, which did not limit the jurisdiction of the Narragansett Tribe, but rather provided the State with concurrent jurisdiction. In *Akins*, we repeatedly warned that our analysis was unique to Maine because of the Maine Settlement Act and the State's Implementing Act. 130 F.3d 482, 484 ("The structure of analysis differs here from that which would be used in claims against the vast majority of other Indian tribes in the country."). We will not require the Narragansett Tribe to meet the "internal tribal matter" exception provided in the Maine

-33-

Implementing Act when Congress did not place a similar limitation on the Narragansetts.

This is not to say that many of the Akins factors are not generally applicable. Nor do we disagree with the district court's conclusion that the Tribe's retained right of sovereignty will not shield the Tribe's unlawful operation of a Smoke Shop that offers non-Indian consumers a means to bypass the State's cigarette tax which would not otherwise be available to them off of the settlement lands.

**4. The State's enforcement of its laws against the Narragansett Tribe**

The next question concerns the extent to which the State may enforce its cigarette laws directly against the Narragansett Tribal government. We find that it is worthwhile to consider the fact that the Narragansett Tribe's sovereign immunity has not been abrogated and that there exist means by which the State could have enforced its cigarette tax laws which would have been more respectful of the Tribe's sovereignty.

The doctrine of tribal immunity is settled law today. The Supreme Court has refused to abandon or narrow this doctrine despite arguments that tribal businesses have become far removed from tribal self-governance and internal affairs. See Kiowa, 523 U.S. at 757. The Court stated that it "retained the doctrine . . .

-34-

on the theory that Congress had failed to abrogate it in order to promote economic development and tribal self-sufficiency."  Id.

For example, in Potawatomi, the Supreme Court "reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid taxes."  Kiowa, 523 U.S. at 755 (citing Potawatomi, 498 U.S. at 510).  "There is a difference between the right to demand compliance with state laws and the means available to enforce them."  Id. (citing Potawatomi, 498 U.S. at 514 ("There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy, but we are not persuaded that it lacks any adequate alternatives.")).  Some of the alternatives referenced in Potawatomi include holding individual agents or officers of the tribe liable for damages in actions brought by the State, see Ex parte Young, 209 U.S. 123 (1908), collecting the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, Colville, 447 U.S. at 161-162, or assessing wholesalers who supplied unstamped cigarettes to the tribal stores, City Vending of Muskogee, Inc. v. Oklahoma Tax Comm'n, 898 F.2d 122 (10th Cir. 1990).  Another option is that the State might enter into an agreement with the Tribe to adopt a mutually satisfactory regime for the collection of its cigarette tax.

Today we have held that the State's cigarette tax laws are applicable to sales to non-Indian customers on the settlement

lands. The State of Rhode Island has numerous alternatives that it may use to enforce its cigarette tax on the settlement lands without violating the Tribe's sovereign immunity. The State's hands will not be completely tied while the Tribe continues to operate its Smoke Shop in violation of the State's cigarette laws. Although the operation of the Smoke Shop without complying with Rhode Island's cigarette tax laws is certainly not a sovereign right retained by the Narragansett Tribe, the Tribe does have a right of sovereign immunity that should be respected the State. For these reasons, we hold that the State violated the Tribe's sovereign rights when it enforced the criminal provisions of its cigarette tax laws by executing a search warrant against the Tribal government's Smoke Shop, forcibly entering the Shop and seizing the Tribe's stock of unstamped cigarettes, and arresting tribal officials who were acting in their official capacity.

## III. <u>Conclusion</u>

For the foregoing reasons, the district court's grant of summary judgment for the State is affirmed in part and, to the extent that the district court's declaratory judgment regarding the State's enforcement of its criminal statutes against the Tribal government is inconsistent with our holdings, reversed in part.

<u>**Affirmed in part, Reversed in part**</u>.