**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANNY L. WILLIAMS; BEVERLY A.
CLARK-MILLER; FREDDIE A.
GRAMPS, JR.; CARRIE JEAN PEDRINI-
PIERSON; CHRISTINE MARIE DOBIS;
CINDY LUSK WICKLANDER; CLAUDIA
GRAMPS; GARY LEE SEEK;
JACQUELINE MARIE CONN; DAVIDA
E. GRAMPS; JULIA JARVIS
WICKLANDER; LAVONNE TRACY
WOODS GRAMPS; LAWRENCE IRA
SEEK; RHONDA LEANN CORKIN;
RICHARD WICKLANDER; RICKY DALE
GRAMPS; RONALD SEEK; ROSE
SHUMARD WICKLANDER; ROXANNE
GRAMPS; RUSSELL D. GRAMPS;
SUSANNE GRAMPS; TERESA MARIE
LISKE; VIVIAN SEBRING; JUNIOR
DALE EDWARDS; SHIRLEY FAYE
UNDERWOOD; CHERRIE MARIE
CLARK; TERESA JUANITA CLARK,
COY EUGENE CLARK; CLINTON
WAYNE STATON; GEORGIA MAY
BURDICK GEORGIA MAY BURDICK
HONROTH; ROBERT ALLEN HONROTH;
ROBERT STANLEY ROTH; CLIFFORD
MILES BURDICK; MICHELLE RENE
BURDICK MICHELLE RENE' BURDICK
SHIELDS; PAMELA SUE BURDICK
PAMELA SUE BURDICK TERRY;

No. 04-17482

D.C. No.
CV-01-02040-WBS

OPINION

7411

RICHARD MILES BURDICK; BONITA
LYNN BURDICK CHAMBERS; GEORGE
RONAD BURDICK; GEORGINA DANYEL
BURDICK; KASEY BROOK BURDICK;
NEVILLE BRAND BURDICK; EMMA
JEAN TIMMONS TUTTLE; LAWRENCE
TUTTLE; KAREN TUTTLE WESR;
RAYMOND TUTTLE; DAVID FIELDS;
ELLEN SEEK; LARRY GRAQCES, SR.;
RICHARD W. GRAVES; CHARLES M.
GRAVES; PEARL W. WAGNER;
MELBA ELLEN RAZO; CHARLES
WESLEY GRAVES; LARRY GRAVES,
JR.; FRAN HAWKINS; LORI WATKINS;
LEANNA GRAVES; KIM GRAVES;
RONALD ARDEL GRAVES; JOANN
PARSONS; JANICE KAYE WRIGHT;
CRISTINA LYNN WILSON; SUE
BROWN DENISE; RICKIE DEAN
WILSON; DAVID LEE WILSON,
              *Plaintiffs-Appellants,*

              v.

KEVIN GOVER,

                    *Defendant,*

              and

CLAY GREGORY,* Regional Director
of the Pacific Region of the
Bureau of Indian Affairs; TROY
BURDICK,** Superintendent of the
Central California Agency of the
Bureau of Indian Affairs; UNITED
STATES OF AMERICA; AURENE
MARTIN, as Acting Assistant
Secretary of the Interior for Indian
Affairs; NEAL MCCALEB, as
Assistant Secretary of the Interior
for Indian Affairs,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, Chief District Judge, Presiding

Argued and Submitted
November 14, 2006—San Francisco, California

Filed June 20, 2007

Before: Andrew J. Kleinfeld and Sidney R. Thomas,
Circuit Judges, and Ronald B. Leighton,*** District Judge.

---

*Clay Gregory is substituted for his predecessor, Ronald Jaeger, as Regional Director [formerly known as "Area Director"] of the Pacific Region [formerly, the Sacramento Area Office] of the Bureau of Indian Affairs, pursuant to Fed. R. App. P. 43(c)(2).

**Troy Burdick is substituted for his predecessor, Dale Risling, as Superintendent of the Central California Agency of the Bureau of Indian Affairs, pursuant to Fed. R. App. P. 43(c)(2).

***The Honorable Ronald B. Leighton, United States District Judge for the Western District of Washington, sitting by designation.

Opinion by Judge Kleinfeld

## COUNSEL

Dennis G. Chappabitty, Sacramento, California, for the appellants.

Kristi C. Kapetan (argued), Assistant U.S. Attorney, Fresno, California, and Debora G. Luther (briefed), Assistant U.S. Attorney, Sacramento, California, for the appellees.

## OPINION

KLEINFELD, Circuit Judge:

This case is controlled by the proposition that an Indian tribe has the power to decide who is a member of the tribe.

### Facts

Plaintiffs claim that they are descended from people who were named as members of the Mooretown Rancheria Indian tribe in either a 1915 census or a 1935 tribal voter list. "Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use

from time to time in the early years of [the twentieth] century — a program triggered by an inquiry (in 1905-06) into the landless, homeless or penurious state of many California Indians."[1] In 1958, the Mooretown Rancheria consisted of two separated 80 acre parcels of land in Butte County, California, near Oroville.

Congress adopted the California Rancheria Termination Act in 1958 in order to distribute rancheria lands to individual Indians.[2] The Act provided for the conveyance of rancheria assets, with unrestricted title, to the individual Indians living there, if a majority of the Indians voting approved. Before conveyance, the Act required the government to survey the land owned by the rancheria, construct or improve the roads serving the rancheria, install or rehabilitate irrigation, sanitation, and domestic water systems, and exchange land held in trust for the rancheria.[3] The Indians who received the assets would not thereafter be entitled to the services provided by reason of Indian status.[4]

Two families occupied the two 80 acre parcels constituting the Mooretown Rancheria. In 1959, the families voted for termination of Mooretown Rancheria and distribution of its land under the Act, and the government distributed the parcels to the members of those families. In 1979, members of thirty-four terminated tribes, including Mooretown Rancheria, filed a class action seeking restoration of tribal status for ran-

---

[1]*Duncan v. United States*, 667 F.2d 36, 38 (Ct. Cl. 1981).

[2]California Rancheria Termination Act, Pub. L. No. 85-671, 72 Stat. 619 (1958).

[3]California Rancheria Termination Act, Pub. L. No. 85-671, § 3, 72 Stat. 619, 620 (1958) (as amended by Pub. L. No. 88-419, 78 Stat. 390 (1964)). *See also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1574 (Fed. Cir. 1988).

[4]California Rancheria Termination Act, Pub. L. No. 85-671, § 10(b), 72 Stat. 619, 621 (1958) (as amended by Pub. L. No. 88-419, 78 Stat. 390 (1964)). *See also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1575 (Fed. Cir. 1988).

cherias. In 1983, the government entered into a consent decree in a class action, restoring the Mooretown Rancheria as a federally-recognized rancheria and Indian tribe.[5]

The Bureau of Indian Affairs ("BIA") invited the plaintiffs and class members at Mooretown Rancheria to a meeting in June 1984. At the meeting, BIA officers explained that each individual landowner could reconvey his or her land to the United States to be held in trust (avoiding taxes and local regulation but subjecting the land to some federal control), or not, as they chose, and that the tribe could form a government. No one chose to put their land in trust and the tribal members at the meeting chose not to organize a tribal government.

Three years later, sentiments had changed. In October 1987, tribal members organized a tribal meeting. They invited all direct descendants of the people who lived at Mooretown Rancheria when it was terminated in 1959, the BIA, and anyone else interested in attending. The BIA did not organize the meeting and no one from the BIA attended the meeting. The lead plaintiff in this case did attend the meeting. At the October 1987 meeting, Mooretown Rancheria decided to organize a tribal government. Soon afterward, Mooretown Rancheria adopted a tribal constitution. According to the constitution, tribal membership consisted of the four people to whom Mooretown Rancheria was distributed upon termination in 1959, their dependents, and lineal descendants of those distributees and their dependants.

The problem that led to this lawsuit is that the plaintiffs got squeezed out of full tribal membership. A 1998 tribal resolution further narrowed full tribal membership to "only those members who are direct lineal descendants of the four distributees." Other tribal members were "reclassified" by the resolution as "adoptee members." Thus, although the plaintiffs are Concow-Maidu Indians descended from people who have

---

[5]*Hardwick v. United States*, No. C 79-1710 SW (N.D. Cal. 1983).

lived at Mooretown Rancheria for a very long time, they lack the rights of full members of the Mooretown Rancheria tribe. This does not affect their status as Indians for the purpose of federal governmental benefits conferred on Indians. But it does affect their tribal voting rights. Depending on tribal decisions, it may also affect their right to a share of the revenues generated by tribal casinos and other tribal activities.

Plaintiffs sued officials of the Department of the Interior, Bureau of Indian Affairs. They did not sue Mooretown Rancheria. The district court dismissed the case on a motion to dismiss and for summary judgment, and plaintiffs appeal.

## Analysis

[1] Plaintiffs have an insuperable problem with their case. An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress.[6] Nor need the tribe, in the absence of Congressional constraints, comply with the constitutional limitations binding on federal and state governments when it exercises this and other powers. In 1978, the Supreme Court held in *Santa Clara Pueblo v. Martinez* that "[a]s separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority."[7] Even where there is some

---

[6]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."). *See Adams v. Morton*, 581 F.2d 1314, 1320 (9th Cir. 1978) ("[U]nless limited by treaty or statute, a Tribe has the power to determine tribal membership."), *accord*, *Apodaca v. Silvas*, 19 F.3d 1015 (5th Cir. 1994) (per curiam); *Smith v. Babbitt*, 100 F.3d 556 (8th Cir. 1996); *Ordinance 59 Assn. v. United States Dept. of the Interior*, 163 F.3d 1150 (10th Cir. 1998). *See also*, Felix S. Cohen, Handbook of Federal Indian Law 98-100, 133-37 (1942).

[7]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) (Marshall, J.). *Santa Clara Pueblo* cites *Roff v. Burney*, 168 U.S. 218 (1897). In *Roff*, the Supreme Court held that the "only restriction on the power" of an Indian tribe "to legislate in respect to its internal affairs is that such legislation shall not conflict with the Constitution or laws of the United States." *Roff v. Burney*, 168 U.S. 218, 222 (1897).

legal constraint on tribes, " 'without congressional authoriza-tion,' the 'Indian Nations are exempt from suit.' "[8] "[T]he tribes remain quasi-sovereign nations which, by government structure, culture, and source of sovereignty are in many ways foreign to the constitutional institutions of the Federal and State governments."[9]

Doubtless because of these well-established limitations, plaintiffs style their complaint as against the BIA, rather than the tribe. They have two theories.

First, plaintiffs argue that the BIA violated the Administra-tive Procedure Act by adopting a "rule" without the required notice and comment procedure.[10] The district court rejected this argument, finding that the BIA never promulgated any "rule." We agree.

It is unclear what "rule" plaintiffs suppose that the BIA promulgated. Plaintiffs note that when the *Hardwick* stipu-lated class action judgment restored a number of terminated rancherias, BIA memoranda mentioned using the lists of peo-ple to whom the rancherias were distributed upon termination, their dependents, and their lineal descendants as a starting point for determining the tribal membership rolls. If the BIA had promulgated such a rule providing for tribal membership, it putatively would impair the claims of plaintiffs in this case, who are descendants of people who appear in the 1915 tribal census and 1935 tribal voter roll, but are not descendants of the distributees.

**[2]** But the BIA carefully avoided promulgating any such rule or policy, respecting the right of the various restored ran-cherias to define their own memberships. In 1984, the BIA invited the known *Hardwick* plaintiffs and class members to

---

[8]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

[9]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71 (1978).

[10]5 U.S.C. § 551.

a meeting where it told them about the *Hardwick* settlement and offered to help them form a tribal government, if they chose to do so. The eleven people who came to the Mooretown Rancheria meeting chose not to organize a formal government. In 1987, Mooretown Rancheria invited the BIA — not the other way around — to an "open meeting," where the Rancheria organized a tribal roll. The invitation, apparently from a member of Mooretown Rancheria, was addressed to direct descendants of the four distributees, but expressly stated that the meeting was "open" and "anyone interested in attending is welcome."

No one from the BIA attended the 1987 meeting. The lead plaintiff in this case did attend. Plaintiffs do not claim that Mooretown Rancheria organized behind their backs. At the meeting, Mooretown Rancheria organized a tribal government. The Rancheria sent the BIA a copy of the attendance list. The BIA provided neither a membership list nor membership criteria. In 1998, Mooretown Rancheria sent the BIA a copy of its Constitution and Enrollment List,[11] limiting tribal membership to lineal descendants of the four 1959 distributees.

**[3]** We cannot identify anything the BIA did that constitutes promulgating a "rule" under the Administrative Procedure Act. The BIA never told Mooretown Rancheria who should qualify for tribal membership. When the BIA invited people to a meeting in 1984, it addressed the invitation, "Dear Plaintiff and Class member." The phrase "class member" referred to the *Hardwick* class action. When Mooretown Rancheria organized, some of the plaintiffs were members. But when in 1998, Mooretown Rancheria decided to limit tribal membership to "only those members who are direct *Lineal Descendants* of the four distributees,"[12] those plaintiffs were

---

[11]Mooretown Rancheria is not organized under the Indian Reorganization Act, so the BIA did not require it to provide these materials.

[12]Mooretown Rancheria, Resolution 98-218, Reclassification of Membership in Accordance With the Constitution of the Mooretown Rancheria, February 18, 1998 (emphasis in original).

squeezed out. Uncontradicted evidence establishes that Mooretown Rancheria itself squeezed them out, and that it did not act at the behest of the BIA.

[4] Under *Santa Clara Pueblo*,[13] Mooretown Rancheria had the power to squeeze the plaintiffs out, because it has the power to define its own membership. It did not need the BIA's permission and did not ask for it, and the BIA never purported to tell it how to define its membership. Plaintiffs argue that the BIA had a policy amounting to a "rule"[14] that tribal membership in restored rancherias ought to consist of the original distributees and their lineal descendants. We find no evidence of any such policy in the record. And given a tribe's sovereign authority to define its own membership, it is unclear how the BIA could have any such policy.

[5] Plaintiffs's best evidence of a BIA policy is its 1984 invitation, which was addressed, "Dear Plaintiff and Class member." Plaintiffs also point to scattered remarks in BIA documents that suggest the BIA looked to the "distributees and heirs" language of the *Hardwick* stipulated class action judgment when it decided whom it should contact about reviving other restored rancherias. The *Hardwick* stipulated judgment defined the class as distributees of each rancheria and their "Indian heirs, legatees or successors in interest." Plaintiffs can only point to the address, and do not purport to challenge the class definition upon which the BIA based the address. The letter did not suggest any tribal membership criteria, did not result in any organization of Mooretown Ran-

---

[13]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

[14]5 U.S.C. § 551(4) (" 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing").

cheria (which chose at that time not to reorganize), and did not coincide with the membership criterion that squeezed plaintiffs out when Mooretown Rancheria eventually adopted the membership criterion fourteen years later.

[6] The record does not establish that the BIA had any "rule" governing tribal membership or suggesting tribal membership criteria in restored rancherias. It does not establish that the BIA had any rule — or that Mooretown Rancheria followed any rule — regarding who could attend tribal meetings and participate in organizing a tribal government. And without a "rule," there can be no violation of the Administrative Procedure Act notice and comment requirements for rules.

[7] Second, plaintiffs argue that the BIA denied them due process of law under the Fifth Amendment because BIA action deprived them of tribal membership. As explained above, nothing in the record supports this allegation. Also, no facts could be proved that would establish such a deprivation. *Santa Clara Pueblo* and its predecessors establish that "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."[15] For this reason, the BIA could not have defined the membership of Mooretown Rancheria, even if had tried.

[8] Plaintiffs suggest that we should distinguish *Santa Clara Pueblo* because the Santa Clara Pueblo were a continuously existing tribe,[16] while Mooretown Rancheria was terminated and restored. Such a distinction would be unsound, because it would deprive restored tribes of the power to determine their own membership. Nothing in the *ratio decidendi* of *Santa Clara Pueblo* supports such a distinction. Throughout the twentieth century, tribal organization or the lack

---

[15]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978).

[16]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978).

thereof presented the members of Mooretown Rancheria with both benefits and detriments, and from time to time their decisions and preferences varied. The termination and restoration of Mooretown Rancheria does not justify depriving it of its sovereign power to define its membership when it organized a tribal government in 1987.

AFFIRMED.